FILED
September 22, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0002102602

7 pages

MEYERS LAW GROUP, P.C.
MERLE C. MEYERS, ESQ. CA Bar #66849
EDIE WALTERS, ESQ. CA Bar #262730
MICHELE THOMPSON, ESQ. CA Bar #241676
44 Montgomery Street, Suite 1010
San Francisco, CA 94104
Telephone: (415) 362-7500
Facsimile: (415) 362-7515

Prospective Counsel for
KOBRA ASSOCIATES, INC., Debtor

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re<br><br>KOBRA ASSOCIATES, INC.<br><br>E.I.N. 68-0097022<br><br>Debtor. | Case No. 09-40068<br><br>Chapter 11<br><br>MLG-001<br><br>Date: September 22, 2009<br>Time: 8:45 a.m.<br>Place: U.S. Bankruptcy Court<br>Courtroom No.35<br>501 "I" Street, Sixth Floor<br>Sacramento, California<br>Judge: Hon. Christopher M. Klein |

**DECLARATION OF ABE ALIZADEH IN SUPPORT OF DEBTOR'S MOTION FOR APPROVAL OF USE OF CASH COLLATERAL ON AN INTERIM AND FINAL BASIS**

I, ABE ALIZADEH, declare:

1.  I am one of the principals of Kobra Associates, Inc. the debtor and debtor-in-possession in the above-captioned chapter 11 case ("Kobra" or the "Debtor").

2.  I am over the age of 18 years and have personal knowledge of each of the facts stated herein below, except as otherwise stated below, and would testify thereto if called upon to do so in a court of law.

3.  Kobra filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 18, 2009 (the "Petition Date").

1

DECLARATION FOR DEBTOR'S MOTION FOR APPROVAL OF USE OF CASH COLLATERAL ON AN INTERIM AND FINAL BASIS
24042 20052

4. On the same date, three affiliates of Kobra, Central Valley Food Services, Incorporated ("Central"), Food Service Management, Incorporated ("FSM") and Sierra Valley Restaurants, Inc. ("Sierra") (collectively with the Debtor, the "JIB Debtors") also filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5. The Debtor's business, along with its affiliates, is the operation of seventy (70) Jack In The Box restaurants throughout Central California. The Debtor and its affiliates employ approximately 2,075 full-time and hourly employees, and their combined annualized revenues are approximately $92,500,000.

6. The JIB Debtors are indebted to four lenders, National Bank of Arizona ("NBA"), City National Bank ("CNB"), Irwin Franchise Capital ("Irwin") and Mechanics' Bank, (the "Secured Lenders") in an aggregate amount of more than $40,000,000. In addition, the Debtor and its affiliates owe roughly $18,000,000 in unsecured debt, to more than 150 suppliers and other vendors, as well as city, state and Federal taxing authorities.

7. Of the Secured Lenders, NBA, CNB and Irwin assert security interests in the inventory and equipment in specific restaurants owned and operated by the JIB Debtors. No two lenders are secured by the same restaurant, and all three of the lenders assert claims against two or more of the JIB Debtors.

8. The Debtor was formed in June 1986 for the operation of existing restaurants and for acquisition. The Debtor's first Jack in the Box franchised restaurant was opened in Oroville, California in 1986. As of the Petition Date, the Debtor owned and operated 33 Jack in Box restaurants (the "Restaurants"), primarily located in northern and central California.

9. As of the Petition Date, the Debtor employed approximately 47 full-time salaried employees and approximately 800 hourly employees. In 2008, the Debtor realized roughly $42 million in gross revenues. In this fiscal year, the Debtor has realized approximately $20,000,000 in gross revenues.

10. In 2005 and 2006, the Debtor entered into three loan agreements with NBA to obtain additional working capital and open additional restaurants: (1) Loan No. 9002, in the amount of $7,950,000, between the Debtor and NBA; (2) Loan No. 9003, in the amount of $9,347,000, between

the Debtor and NBA; and (3) Loan No. 9001, in the amount of $3,200,000, between me and Austin Wallestad, as borrowers, and NBA, as lender (collectively, together with related notes and security agreements, the "NBA Loan Agreements").

11. NBA also made additional loans to FSM and Sierra secured by an interest in seven other Jack in the Box franchise restaurants

12. Obligations owing under the NBA Loan Agreements are secured by eight commercial security agreements executed at various times by the Debtor, FSM, me and Austin Wallestad. Mr. Wallestad owns 25 percent of the stock of Central and Sierra. Those security agreements grant to NBA liens encumbering all inventory and equipment, among other assets, of 28 Jack in the Box franchise restaurants, 21 of which are the NBA Collateral Restaurants owned and operated by the Debtor. The remaining seven restaurants are owned and operated by FSM and Sierra.

13. As of the Petition Date, NBA was owed approximately $18,000,000, by the Debtor, FSM and Sierra jointly.

14. FSM, Kobra Alizadeh (my sister) and I each executed guarantees in favor of NBA with respect to obligations owing under Loans Nos. 9002 and 9003.

15. In June 2004, the Debtor entered into a series of loan agreements with Irwin: Loans nos. 007-0018405-100 through 110, each loan in the amount of $440,000, and Loan no. 18602-102 (collectively, together with related notes and security agreements, the "Irwin Loan Agreements"). Under the Irwin Loan Agreements, Irwin was granted liens encumbering all inventory and equipment, among other assets, of 12 Jack in the Box franchise restaurants, 11 of which are owned and operated by the Debtor. The remaining restaurant is owned and operated by Sierra.

16. FSM, Kobra Alizadeh and I each executed guarantees in favor of Irwin with respect to obligations owing under the Irwin Loan Agreements.

17. In February 2008, the Debtor entered into two loan agreements with CNB to obtain additional working capital and open additional restaurants (collectively, together with related notes and security agreements, the "CNB Loan Agreements").

18. Obligations owing under the CNB Loan Agreements are secured by liens encumbering all inventory and equipment, among other assets, of thirty Jack in the Box franchise restaurants, one

DECLARATION FOR DEBTOR'S MOTION FOR APPROVAL OF USE OF CASH COLLATERAL ON AN INTERIM AND FINAL BASIS
24042 20052

of which is owned and operated by the Debtor. The remaining twenty-nine restaurants are owned and operated by FMS and Central.

19. As of the Petition Date, CNB was owed approximately $16,375,800 by the JIB Debtors, on a consolidated basis.

20. As of the Petition Date, Irwin was owed approximately $3,700,000, by the Debtor and Sierra jointly.

21. The Debtor is owned by me, Kobra Alizadeh and FSM. FSM is wholly owned by me.

22. I have has worked in Jack In The Box restaurants for over 30 years, first as an employee and then as a franchisee. I now operate the second most Jack In The Box restaurants in the nation and have received numerous awards over the course of his career, including Franchisee of the Year in 2006 and 2007, by Franchise Times, and 2007 Top 200 Restaurant Franchisees by Franchise Monitor.

23. The overall annualized revenues of the JIB Debtors together is approximately $92,535,600.00. For the last fiscal year, ending December 31, 2008, the JIB Debtors reported net income in the amount of $5,691,516.00 on a consolidated basis. As of the Petition Date, the JIB Debtors owed approximately $17,890,000.00 in unsecured debt owed to hundreds of suppliers, vendors and tax authorities.

24. The JIB Debtors have historically been profitable and independently viable, having reported net income of more than $18,500,000 in the last three reported fiscal years. However, a sizeable portion of the JIB Debtors' income has been used in recent years to subsidize operating losses in certain real estate ventures that are affiliates of the JIB Debtors. Those affiliates are now debtors in separate chapter 11 cases pending in the Sacramento Division, where a chapter 11 trustee has been appointed, and although all such uses of the JIB Debtors' income has long since ended, the prior use of funds left the JIB Debtors with insufficient cash flow and delinquencies owing to its own creditors.

25. Among other delinquencies, the JIB Debtors are in default to the California State Board of Equalization (the "BOE"), for several millions of dollars of unpaid sales taxes. As a result, on September 16, 2009, the BOE revoked the JIB Debtors' provisional licenses to operate their 70

restaurants franchises, and advised the JIB Debtors that those licenses would be reinstated only upon the commencement of chapter 11 cases. The JIB Debtors were therefore compelled to close all of their restaurants temporarily until chapter 11 petitions could be filed.

26. The JIB Debtors then filed their chapter 11 petitions as quickly as possible, on September 18, 2009, in order to avoid further substantial disruption and harm to the restaurants' operations and enterprise value.

27. In November 2005, Central entered into a loan agreement with Mechanics Bank (the "Mechanics Loan") for funds to construct a Jack in Box franchise located Oakhurst, California.

28. The Mechanics Loan is collateralized by a security interest in the certain equipment located on the premises of the Oakhurst franchise. To the best of the Debtor's knowledge, Mechanics Bank does not assert any interests in the cash collateral of the JIB Debtors.

29. Vistar Corporation and its affiliates (collectively, "Vistar") assert a lien under the Perishable Agricultural Commodities Act, or PACA, against all of the JIB Debtors' assets, including cash collateral, in the amount of $282,912.53, senior to the secured claims of NBA, CNB, Irwin and Mechanics. That priority may be disputed by other lenders, and may be disputed by the JIB Debtors as well. Vistar also asserts a greater secured claim against certain assets other than cash collateral.

30. The Budget has been prepared on a conservative basis, including imposition of a 10% discount of expected revenues in order to account for the possibility of continued revenue losses occasioned by the JIB Debtors' recent disruptions in operations.

31. As set forth in the Budget, the Debtor estimates that it will produce net positive cash flow from its continued operations, after full payment of all postpetition expenses, so that none of the secured claimants' collateral (taking into account replacement liens) will be diminished by such use.

32. The Debtor's anticipated expenses proposed to be paid during those period include, among other items, the following expected costs:

33. Normal store-level operating costs, such as payroll, supply purchases, rent and franchise fees;

    A. Wages and benefits earned by the Debtor's employees prior to the Petition Date, to the extent coming due after the Petition Date and equal to or less than priority claims

DECLARATION FOR DEBTOR'S MOTION FOR APPROVAL OF USE OF CASH COLLATERAL ON AN INTERIM AND FINAL BASIS
24042 20052

that would otherwise accrue to those employees, subject to approval by the Bankruptcy Court which will be sought by separate motion;

B. General and administrative expenses incurred by the Debtor in the ordinary course of business; and

C. Interim fees and expenses earned by the Debtor's substitute counsel, Meyers Law Group (up to $50,000.00 per month prorated among all four JIB Debtors), and the Debtor's independent restructuring officers from Focus Management Group (up to $25,000.00 per month prorated among all four JIB Debtors), subject to Court approval under Section 331 of the Bankruptcy Code which will be sought by separate motions.

34. Since the commencement of the Debtor's chapter 11 case, the Debtor has initiated cash collateral discussions with CNB, Irwin, Vistar and NBA. CNB and Irwin have fully cooperated with the Debtor and have provisionally consented to the use of their cash collateral for limited purposes within their respective restaurants, including limited cash advances to hourly employees in order to avoid personal and catastrophic losses to those employees by virtue of delay in funding of their paychecks. NBA has refused to provide similar consents, and Vistar is at present considering the Debtor's request.

35. The Debtor's ability to fund it continued operations as projected in the Budget is vital to the maintenance of the Debtor's value and that of the JIB Debtors' enterprise as a whole. Without the Debtor's proposed funding, its going-concern value is likely to be substantially and irretrievably diminished, as restaurants are required to close again, losing customers, employees, suppliers and other important partners in the enterprise.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on September 21, 2009 at Roseville, California.

                                                 /s/ Abe Alizadeh
                                                 ABE ALIZADEH