FILED
September 22, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0002102593

6 pages

MEYERS LAW GROUP, P.C.
MERLE C. MEYERS, ESQ., CA Bar #66849
EDIE WALTERS, ESQ., CA BAR #262730
MICHELE THOMPSON, ESQ., CA Bar #241676
44 Montgomery Street, Suite 1010
San Francisco, CA 94104
Telephone: (415) 362-7500
Facsimile: (415) 362-7515

Prospective Counsel for Debtor-in-Possession
KOBRA ASSOCIATES, INC.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

In re:

KOBRA ASSOCIATES, INC.,

    Debtor.

Case No. 09-40068

Chapter 11

MLG-002

Date: September 22, 2009
Time: 8:45 a.m.
Place: U.S. Bankruptcy Court
Courtroom No.35
501 "I" Street, Sixth Floor
Sacramento, California
Judge: Hon. Christopher M. Klein

**DECLARATION OF ABE ALIZADEH IN SUPPORT
OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER
AUTHORIZING TO PAY PREPETITION (I) WAGES AND SALARIES,
(II) VACATION LIABILITIES, (III) BONUSES, AND (IV) REIMBURSABLE EXPENSES**

I, ABE ALIZADEH, declare:

    1.    I am one of the principals of Kobra Associates, Inc. ("Kobra" or the "Debtor") the debtor and debtor-in-possession in the above-captioned chapter 11 case.

    2.    I am over the age of 18 years and have personal knowledge of each of the facts stated herein below, except as otherwise stated below, and would testify thereto if called upon to do so in a court of law.

    3.    The Debtor filed its voluntary petition herein for relief under chapter 11 of the Bankruptcy Code on September 18, 2009 (the "Petition Date"). The Debtor continues to operate its

1

DECLARATION IN SUPPORT OF PREPETITION WAGES MOTION
240433/20052

business as a debtor in possession pursuant to the provisions of Sections 1107(a) and 1108 of the Bankruptcy Code, no trustee having been appointed.

4. Affiliates of the Debtor, Food Service Management, Inc. ("FSM"), Central Valley Food Services, Inc. ("Central"), and Sierra Valley Restaurants, Inc. ("Sierra") have also filed voluntary chapter 11 petitions for relief on September 18, 2009.

5. Kobra Associates, Inc., the Debtor, was formed in June 1986 for the operation of existing restaurants and for acquisition. The Debtor's first Jack in the Box franchised restaurant was opened in Oroville, California in 1986. As of the Petition Date, the Debtor owned and operated 33 Jack in Box restaurants (the "Restaurants"), primarily located in northern and central California. The Debtor's primary assets consist of the 33 Jack in Box restaurants (the "Restaurants").

6. The Debtor is owned and operated by me, Kobra Alizadeh and FSM. FSM is wholly owned by me.

7. The Debtor, FSM, Central and Sierra (collectively, the "JIB Debtors") together own and operate seventy (70) Jack In The Box restaurants in Central and Northern California, through multiple real property leases, franchise agreements with Jack in the Box Corporate ("JIB Corporate"), food and equipment supply contracts and other relationships with vendors, lenders and employees. At present, the JIB Debtors employ approximately 2,075 full-time and hourly employees, of which roughly 47 full-time employees and 800 hourly employees are employed directly by the Debtor. The JIB Debtors' present annualized revenues are approximately $39,925.500.00 and the overall annualized revenues of the JIB Debtors together is approximately $92,535,600.00 For the last fiscal year, ending December 31, 2008 the JIB Debtors reported net income in the amount of $5,691,516.00 on a consolidated basis. As of the Petition Date, the JIB Debtors owed approximately $17,890,000.00 in unsecured debt owed to hundreds of suppliers, vendors and tax authorities.

**Need for Bankruptcy Protection**

8. The JIB Debtors have historically been profitable and independently viable, having reported net income of more than $18,500,000 in the last three reported fiscal years. However, a sizeable portion of the JIB Debtors' income has been used in recent years to subsidize operating losses in certain real estate ventures that are affiliates of the JIB Debtors. Those affiliates are now

debtors in separate chapter 11 cases pending in the Sacramento Division, where a chapter 11 trustee has been appointed, and although all such uses of the JIB Debtors' income has long since ended, the prior use of funds left the JIB Debtors with insufficient cash flow and delinquencies owing to its own creditors.

9. Among other delinquencies, the JIB Debtors are in default to the California State Board of Equalization (the "BOE"), for several millions of dollars of unpaid sales taxes. As a result, on September 16, 2009, the BOE revoked the JIB Debtors' provisional licenses to operate their 71 restaurants franchises, and advised the JIB Debtors that those licenses would be reinstated only upon the commencement of chapter 11 cases. The JIB Debtors were therefore compelled to close all of their restaurants temporarily until chapter 11 petitions could be filed.

10. The JIB Debtors then filed their chapter 11 petitions as quickly as possible, on September 18, 2009, in order to avoid further substantial disruption and harm to the restaurants' operations and enterprise value.

**Use of Cash Collateral**

11. The Debtor has filed an emergency motion concurrently herewith for and order of the Court granting interim use of cash collateral by the Debtor in which three secured lenders, National Bank of Arizona ("NBA"), Irwin Franchise Capital ("Irwin") and City National Bank ("CNB," and collectively with NBA and Irwin, the "Secured Lenders") hold a secured interest. The Debtor seeks court approval of authorization on an interim basis to use cash collateral to the extent included in an agreed budget (the "Budget") and either (a) incurred on or after the Petition Date or (b) incurred prior to the Petition Date and approved by separate order of the Court, upon notice to the Secured Lenders.

12. By its Motion, the Debtor seeks such separate order in order to permit the payment or honoring of certain prepetition obligations, as set forth below, all of which are included in the Budget.

**Prepetition Wages**

13. In the ordinary course, the Debtor pays its regular employees on a semi monthly basis, five to seven business days after the end of each pay period, seven days in arrears. The Debtor's next

3
DECLARATION IN SUPPORT OF PREPETITION WAGES MOTION
240433/20052

scheduled pay day is Friday, September 25, 2009, covering the pay period from September 7, 2009 to September 20, 2009, inclusive (the "Prepetition Pay Period")..

14. As of the Petition Date, the Debtor owed approximately $268,000.00 in prepetition hourly wages and salaries earned during the Prepetition Pay Period. In addition, a small number of the Debtor's employees neglected to deposit his or her paycheck from earlier pay periods, in an aggregate amount of no more than $86,000 and earned no earlier than August 2, 2009; and those paychecks must now be reissued. Thus, in all, roughly $329,000.00 is owed by the Debtor for wages, both hourly and salaried, that were outstanding as of Petition Date (collectively, the "Prepetition Wages").

**Prepetition Vacation**

15. In the ordinary course of business, the Debtor's employees are entitled to use vacation pay as vacation hours are accrued. Additionally, upon termination of employment, an employee is entitled to cash payment for the amount of any unused vacation time accrued at the employee's then current rate of pay.

16. As of the Petition Date, the Debtor's aggregate prepetition vacation time liability owed to its employees totaled approximately $37,000 (the "Prepetition Vacation").

**Prepetition Bonuses**

17. Also, a number of the Debtor's employees earn bonuses based on service criteria (the "Prepetition Bonuses"). For the second calendar quarter period, 47 employees of the Debtor are owed approximately $87,700.00, in the aggregate, as bonuses for achieving customer service performance ratings and budgetary goals.

**Prepetition Reimbursements**

18. In addition, a small number of the Debtor's employees are entitled to reimbursement of expenses for mileage accrued during the ordinary course of business (the "Prepetition Reimbursements"). As of Petition Date, the Debtor owed approximately $865.00, in the aggregate, to a select number of employees for mileage reimbursements.

### Priority Cap of Section 507(a)(4)

19. Attached hereto as **Exhibit "A"** is a chart identifying the Prepetition Wages, Prepetition Vacation, Prepetition Bonuses and Prepetition Reimbursements, on an employee-by-employee basis. As reflected in the chart, the no employee is entitled to those payments in a sum that is greater than $10,950, the priority cap of Section 507(a)(4) of the Bankruptcy Code, and all were earned within the 180-day period immediately preceding the Petition Date.

### Need for Payment

20. The Debtor expects to pay all unpaid priority wage claims in full in this case, upon confirmation of a plan of reorganization. As reflected in the Debtor's concurrent cash collateral motion, the Debtor anticipates positive cash flow from its operations, and that cash flow will eventually form part of the basis of its reorganization.

21. However, the Debtor's employees in many cases cannot wait for plan confirmation to be paid, because they need timely payment in order to satisfy personal obligations for rent, food, medical care, child daycare and the like. Therefore, it is imperative for the health and safety of the Debtor's employees that they be paid wages and other employment benefits earned prior to the Petition Date as soon as possible.

22. On an interim basis, in some cases and only where permitted by lenders holding liens upon cash collateral, the Debtor and its affiliate debtors have made small advances to the most needy of their employees, in amounts that are equal to or less than 50% of their normal paychecks, in order to ameliorate the hardship of having missed a paycheck due from the debtors. However, that practice cannot continue and cannot solve employees' difficulties for more than a few days.

23. If the Debtor is not able to pay the Prepetition Wages, Vacation, Bonuses and Reimbursements immediately, its employees will be harmed unfairly and may be compelled to terminate their employment with the Debtor, jeopardizing its continued operations. Such terminations, if widespread, could have a disastrous impact upon the value of the Debtor's enterprise.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on September 21, 2009 at Roseville, California.

/s/ Abe Alizadeh
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　ABE ALIZADEH